## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RICHARD KEITH BARBER

     *Plaintiff*,

*v.*                    CASE NO. 2:13–CV–14098

COMMISSIONER OF         DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,       MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff's claim for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 10.)

Plaintiff Richard Keith Barber was almost twenty years old at the most recent administrative hearing on April 4, 2012. (Transcript, Doc. 6 at 32, 123.) Plaintiff states in his disability report that he has never worked. (Tr. at 144.) Plaintiff filed the present claim on February 26, 2010, alleging that he became unable to work on May 7, 1992. (Tr. at 123, 144.) The claim was denied at the initial administrative stages. (Tr. at 66.) In denying Plaintiff's claims, the Commissioner considered affective disorders, obesity and other hyperalimentation. (*Id*.) On April 4, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Theodore W. Grippo, who considered the application for benefits *de novo*. (Tr. at 14-29, 30-44.) In a decision dated May 15, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 14-29.) On May 22, 2012, Plaintiff requested an Appeals Council review of this decision. (Tr. at 12-13.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 23, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On September 25, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

## B.    Standard of Review

Congress established, through the Social Security Act and its subsequent amendments,  a statutory right for disabled individuals to collect disability benefits. 42 U.S.C. §§ 301-1397. With the Act, Congress also established the Social Security Administration ("SSA") and gave it (1) adjudicative power "to administer the old-age, survivors, and disability insurance[,] . . . and the supplemental security income program[s]" under 42 U.S.C. § 901, and (2) rulemaking power,

subject to rulemaking procedures, for the Commissioner to "prescribe such rules and regulations" when determined "necessary or appropriate to carry out the functions of the Administration" under 42 U.S.C. § 902. Therefore, the Social Security Administration ("the Agency") makes factual determinations about when a person qualifies for disability benefits and also establishes regulations to guide the administration of benefits.

The Agency has promulgated the following rules[2] for the administration of its disability insurance benefits. 20 C.F.R. 401-422. First, a state agency, "acting under the authority and supervision of the Agency," usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If a claimant is denied, he or she may seek review of the state's decision with the Agency's three stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after exhausting the Agency's administrative remedies, that is, after the Commissioner has issued a final administrative decision that is unfavorable, may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review since we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

---

[2] The federal judiciary's review of the Agency's promulgated regulations is limited to ensuring the rules do not exceed the authority given to the Agency by Congress and that they are not arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.

record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record before the ALJ only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.   Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the

6

claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones*, 336 F.3d at 474, *cited with approval in Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through May 6, 2014, and had not engaged in substantial gainful activity since May 7, 1992, the alleged onset date. (Tr. at 19-20.) At step two, the ALJ found that Plaintiff's borderline intellectual functioning was "severe" within the meaning of 20 C.F.R. § 404.1520. (Tr. at 20.) At step three, the ALJ found no evidence that Plaintiff's

combination of impairments met or equaled one of the listings in the regulations. (Tr. at 21-22.) At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. at 25.) The ALJ also found that at the alleged onset date Plaintiff was zero years old and so he fell into the "younger individual" range of under fifty years old at the time. (Tr. at 25.) At step five, the ALJ found that Plaintiff could perform "a full range of work at all exertional levels but with the following nonexertional limitations: claimant is able to understand, remember and carry out simple, routine and repetitive tasks of the type called for by unskilled work." (Tr. at 22.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 26.)

### E.   Administrative Record

### 1.   Medical History

On August 14, 2002, when Plaintiff was a little over ten years old, he saw licensed Psychologist Rochelle Manor for an assessment. (Tr. at 176-82.) Plaintiff's mother said he was an "easygoing" infant and that he "reached physical and verbal milestones at appropriate ages." (*Id.*) She reported that she started noticing significant changes in Plaintiff around the third grade. (*Id.*) For example, he had gained a lot of weight and his behavior had "become much worse." (*Id.*) His school had found that he "qualif[ied] for Special Education under the EMI designation." (*Id.*) Plaintiff's mother reported his symptoms as "very irritable and cranky[,] . . . obsessed with wanting money," and "concrete thinking." (*Id.*) Plaintiff also complained about tags in his clothing and gained weight "when allowed to eat whatever he want[ed]." (*Id.*) At this time, Plaintiff had only recently been able to go to sleep without his mother in the room, still seemed obsessed over her location, and experienced great fear and anxiety when she was not around. (*Id.*) Plaintiff needed a great deal of coaching before interacting with friends. (*Id.*)

8

Dr. Manor's summary and recommendations stated that "[t]he current testing is consistent with previous testing findings, suggesting that [Plaintiff's] intellectual ability is within the borderline range." (*Id.*) It went on to note that he "has the ability to learn information, particularly when repetition is provided . . . ." (*Id.*) Also she noted an "unusual neuropsychological pattern" that included "some aspects of impulsivity and yet great diligence in other areas." (*Id.*) She stated that his "vocabulary and ability to express himself with words [was] significantly less than expected for his age," and that this likely interfered with his ability to relate to his peers and to adults. (*Id.*) Dr. Manor recommended that Plaintiff continue in special education and that interaction and life skills continue to be a part of his curriculum. (*Id.*) She also recommended that he be evaluated for possible use of psychotropic medication for his attention and concentration. (*Id.*)

On October 1, 2003, Plaintiff saw Josephine Kasa-Vubu, M.D., in the Pediatric Endocrinology Clinic at the University of Michigan. (Tr. at 183-84.) Dr. Kasa-Vubu noted that Plaintiff's weight gain had been rapid since starting treatment on Risperdal and that he was currently "morbidly obese." (*Id.*) At the time he was taking Prozac daily and Risperdal, which had been cut in half because of the weight gain. (*Id.*) At this physical examination, Plaintiff was 161.2 cm (five foot three inches), weighed 85.2 kg (188 pounds), and had a flat affect. (*Id.*)

Plaintiff underwent inpatient treatment at Pine Rest Christian Mental Health Services from October 10 to October 14, 2003. (Tr. at 185-97.) He was admitted to the program because of "[a]ggressive and defiant behaviors, homicidal threats, and destruction of property." (*Id.*) His behavior was described as "out of control[,] . . . rageful and defiant at home and at school" and when given limits: he had pulled the phone off the wall, stolen money from his mother in front of

her coworkers, caused his mother to contact the police about his behavior, often refused to go to bed, kicked his mother while she was driving, dumped his mother's purse out in the parking lot when she would not buy him a magazine, made obscene comments, destroyed property, and kicked and hit his mother and his aunt when they attempted to enforce rules. (*Id.*) While Plaintiff denied homicidal ideation, at intake he indicated that he had threatened to kill his brother. (*Id.*)  He also indicated thoughts of wishing himself dead. (*Id.*)

He was positive for weight gain, sleep problems, abdominal pain, and gastrointestinal upset. (*Id.*) At that time he was taking Risperdal, Prozac, and Tenex. (*Id.*) He was in special education for "emotional impairment." (*Id.*) His affect was "blunted," his insight was poor, he tended to minimize problems, his judgment was poor and impulsive, his mood was depressed and irritable, his muscle tone was normal, and his gait was normal. (*Id.*) His admission diagnosis (DSM IV) was, depressive disorder not otherwise specified ("NOS"), bipolar disorder NOS was to be ruled out, oppositional defiant disorder, and reading disorder for Axis I; obesity for Axis III; school problems and problems with primary support for Axis IV; and a current Global Assessment of Functioning ("GAF") of 25 and a highest past year GAF estimate of 60 for Axis V. (*Id.*)  Plaintiff also complained of abdominal pain and constipation upon initial examination. (*Id.*) Laboratory findings showed his average whole blood glucose and his fasting glucose were normal. (*Id.*) His condition at discharge was "improved," "rule out bipolar disorder NOS" was removed from his Axis I, and his final GAF was 55 for his Axis V. (*Id.*) His medications were modified to prevent more weight gain and upon discharge he was on Wellbutrin and Abilify. (*Id.*)

Plaintiff was treated by Dr. Anoop Thakur, M.D., from March 7, 2005 to July 10, 2006. (Tr. at 200-11.) On March 7, 2005, Plaintiff's father complained of oppositional defiance: he reported

that Plaintiff was "mouthy, and disrespectful[,] . . . trie[d] to pick . . . fight[s] with his mother, . . . . d[id] not like to attend school," and had difficulty accepting "no." (*Id.*) At this visit, Plaintiff rated his mood as a four on a scale of one to ten. (*Id.*) He had no suicidal ideations, his concentration was fair, and his judgment and insight were very poor. (*Id.*) His Axis I was mood disorder NOS, oppositional defiant disorder, by history, and reading disorder; his Axis II was borderline intellectual functioning, by history; his Axis III was flat footed and overweight; his Axis IV was "[p]oor academic functioning, poor attendance to school, [and] difficulty with family members; and his Axis V GAF was 50 to 55. (*Id.*) Plaintiff missed his appointment on August 15. (*Id.*) On August 22 Plaintiff's mood was euthymic, his affect was appropriate, and he seemed to have gained weight. (*Id.*) His Axis I was mood disorder NOS and oppositional defiant disorder; his Axis II was borderline intellectual functioning, by history; and his Axis V GAF was 55 to 60. (*Id.*) On October 10, he reported feeling tired in the morning and missing a lot of school; he did not report anger issues. (*Id.*) Plaintiff missed his November 21 appointment. (*Id.*)

On January 23, 2006 Plaintiff's father reported that he was "acting poorly, depressed, not attending school, [and] getting violent." (*Id.*) His primary care physician had taken him off his trial of Abilify and Risperdal. (*Id.*) He was sleeping excessively, was not attending school at all, had poor ambition and motivation, and was eating excessively. (*Id.*) At this visit his mood was quiet, his affect was dull, and his judgment and insight were poor. (*Id.*) His Axis I was mood disorder NOS, possible bipolar mood disorder, depressed phase, and oppositional defiant disorder, by history; his Axis II was borderline intellectual functioning. (*Id.*) He was started on Geodon and was told to follow up in four weeks. (*Id.*) On February 27 Plaintiff's mood was calm, his affect was appropriate, his self care was fair, and he "seem[ed] to have truncal obesity." (*Id.*) He complained

of disabling severe anxiety and had only attended seven to eight days of school so far that year. (*Id.*) His Axis I was mood disorder NOS, possible bipolar mood disorder, most recent episode depressed type, oppositional defiant disorder, by history, and learning disability; his Axis II was borderline intellectual functioning. (*Id.*) Dr. Thakur added Klonopin at bedtime to Plaintiff's medication. (*Id.*)

Plaintiff missed his April 3 appointment. (*Id.*) On May 15, Plaintiff's mood was quiet and his affect was appropriate. (*Id.*) His Axis I was mood disorder NOS, possible bipolar mood disorder, oppositional defiant disorder, by history, and learning disability; his Axis II was borderline intellectual functioning. (*Id.*) On June 6, Plaintiff "continue[d] to struggle with temper outbursts, throwing things, hitting walls," was crying a lot, was easily bored, and was having "fits." (*Id.*) At this visit his mood was quiet and his affect was appropriate; he was respectful, cordial, and polite; he had no suicidal or homicidal ideations or plans; and his judgment and insight were still limited. (*Id.*) His Axis I was mood disorder NOS and oppositional defiant disorder; his Axis II was borderline intellectual functioning, by history; and his Axis V was 55. (*Id.*) Plaintiff missed his July 10 appointment. (*Id.*)

On October 7, October 9, and October 17, 2003, as a part of his special education eligibility, Plaintiff was evaluated by Branch Intermediate School District's school psychologist James Marolt, M. Ed. (Tr. at 256-58.) His previous Wechsler Intelligence Scale for Children ("WISC-III") scores were verbal IQ 74, performance IQ 78, and full scale IQ 74. (*Id.*) His current full scale IQ was considered borderline at 78. (*Id.*)

Plaintiff was again evaluated on October 6, 2006, this time by Branch Intermediate School District's school psychologist Michael Bodkins; as part of the evaluation he underwent a Wechsler

Individual Achievement Test, 2nd Edition ("WIAT-II"). (Tr. at 212-13.) He had been re-classified from cognitive impairment to learning disabled. (*Id.*) His psychological profile reflected "academic skill deficits and ongoing frustrations in his attempts to compete academically." (*Id.*) His WIAT-II scores were as follows: his word reading SS was 81 with a GE of 5.9, his reading comprehension SS was 90 with a GE of 7.0, his numeric operations SS was 77 with a GE of 5.2, his math reasoning SS was 73 with a GE of 5.9, and his written expression SS was 65 with a GE of 4.8. (*Id.*) Recommendations from this evaluation were that his "academic profile in math and reading clearly substantiate the need for special education programming." (*Id.*) His psychological profile suggested "the need for fairly extensive special education programming." (*Id.*) Plaintiff did not perform commensurate with his ability in mathematics calculation, mathematics reasoning, and written expression. (Tr. at 214.)

Plaintiff was treated on July 28 and October 15, 2009 at CHC Pediatrics & Adolescent Center. (Tr. at 281-84.) On July 28 he complained of heartburn and blood pressure and was concerned about his blood sugar. (*Id.*) On October 15 he complained of heartburn, abdominal pain, and a rash. (*Id.*)

Plaintiff was treated at Select Health on March 1 and March 23, 2010. (Tr. at 285-92.) On March 1, Plaintiff presented with heartburn, which had been present for about two years. (*Id.*) Upon review of his symptoms at this visit, he was positive for unintentional weight gain; his eyes were normal; his E/N/T was normal except positive for "tinnitus, nasal congestion, frequent rhinorrhea and hoarseness"; his cardiovascular was normal; his respiratory was normal except positive for a recent cough; his gastrointestinal was normal except positive for heartburn; his genitourinary was normal except positive for hematuria; his musculoskeletal was normal; his

integumentary was normal except positive for "extremely dry skin and pruritis"; his neurological was normal except positive for ataxia; his hematologic/lymphatic was normal; his endocrine was normal except positive for polydipsia and polyphagia; his allergic/immunologic was normal except positive for seasonal allergies; and his psychiatric was "[p]ositive for anxiety, depression and feelings of stress," and "[n]egative for crying spells, personality change, difficulty concentrating, recreational drug use, sadness or suicidal thoughts." (*Id.*) He was 306 pounds and 69 inches tall. (*Id.*) He was prescribed Prilosec for his heartburn. (*Id.*)

On March 23, Plaintiff complained of heartburn, a rash, and for the three days preceding this appointment, symptoms of "chest congestion, cough, nasal congestion and watery, green nasal discharge." (*Id.*) The rash had been a problem for Plaintiff for the previous two years, and was located mostly on his hands. (*Id.*) A review of Plaintiff's symptoms included "[p]ositive for nasal congestion, frequent rhinorrhea, hoarseness and persistent sore throat." (*Id.*) He was also "[p]ositive for alcohol and/or drug use, depression and discipline problems." (*Id.*) In this report it was also noted that Plaintiff smoked about a half pack of cigarettes a day. (*Id.*) The physical exam showed normal general appearance, eyes, E/N/T, neck, respiratory except for coarse breath sounds, cardiovascular, gastrointestinal, lymphatic, skin except for dyshidrotic eczema, musculoskeletal, neurological, and psychiatric. (*Id.*) He had normal range of motion, strength, and tone; his motor and sensory function, reflexes, gait, and coordination were all intact; and his affect and demeanor were appropriate. (*Id.*) He was assessed with heartburn, acute bronchitis, and a rash. (*Id.*)

On June 1, 2010, Plaintiff had a consultative examination with Psychologist Carol Lehmann, M.A. (Tr. at 293-300.) He received no diagnoses for Axis I; for Axis II he had borderline intellectual functioning; Axis III was obesity; and Axis V was a GAF of 65. She said

that he may have "some physical limitations related to his weight, but he [was] capable of performing simple tasks and of interacting appropriately with others." (*Id.*) She also said that he had "no history of compliance with either medical treatment or school attendance" and "little experience with [for example] regular hours, responsibility, [and] expectations." (*Id.*) Dr. Lehman also administered a WAIS IV test, which resulted in a verbal comprehension score of 76, a perceptual reasoning score of 79, a working memory score of 105, a processing speed score of 71, and a full scale IQ of 77. (*Id.*) Dr. Lehman stated that the tests were consistent with the results of prior tests, and that a full scale IQ score of 77 classified Plaintiff with a "borderline" intelligence overall. (*Id.*)

On October 20, 2010, Plaintiff went to Select Health with cold symptoms and was diagnosed with an acute upper respiratory infection. (Tr. at 303-05.) His E/N/T was "[p]ositive for nasal congestion, frequent rhinorrhea, hoarseness and persistent sore throat"; his cardiovascular, respiratory, musculoskeletal, integumentary, and neurological, were all normal. (*Id.*) He had normal range of motion, strength, and tone; his "cranial nerves, motor and sensory function, reflexes, gait and coordination [were] all intact"; and his affect and demeanor were appropriate. (*Id.*)

On March 8, 2011, Plaintiff went to the Community Health Center of Branch County complaining of a cough and fever that had started that day. (Tr. at 318-19.) The clinical impression was acute fever and acute bronchitis.  (*Id.*)

On April 18, 2011, Plaintiff saw Dr. Charles Whitaker complaining about shoulder pain. (Tr. at 313-14.) Dr. Whitaker noted that the pain was "deep," did not radiate, had started about two weeks ago, and was described by Plaintiff as intermittent, throbbing, and aching; Plaintiff denied other joint-related symptoms. (*Id.*) Plaintiff's E/N/T, cardiovascular, respiratory, integumentary,

15

and neurological were normal. (*Id.*) His musculoskeletal exam was normal except that he was positive for joint pain. (*Id.*) At the time of this visit, Plaintiff only reported taking Prilosec. (*Id.*) Plaintiff experienced pain with range of motion in his left shoulder flexion and extension; his cranial nerves, motor and sensory function, reflexes, gait, and coordination were all intact; and his affect and demeanor were appropriate. (*Id.*) He was assessed with shoulder pain and muscle strain and prescribed Motrin. (*Id.*)

On November 28, 2011, Plaintiff went to Dr. Whitaker with cold symptoms. (Tr. at 339-41.) A review of his symptoms showed that he was positive for nasal congestion, frequent rhinorrhea and hoarseness, recent cough, dyspnea and frequent wheezing, heartburn, extremely dry skin, and perennial allergies; was negative for chills, fatigue, fever, and weight change; and his cardiovascular, genitourinary, musculoskeletal, neurological, hemologic/lymphatic, endocrine, and psychiatric were all normal. (*Id.*) At this time he was smoking a pack of cigarettes and drinking about six caffeinated soft drinks per day. (*Id.*) He had normal range of motion, strength, and tone; his "cranial nerves, motor and sensory function, reflexes, gait, and coordination" were all intact; also his affect and demeanor were appropriate. (*Id.*) He was assessed with acute bronchitis and put on Bactrim DS. (*Id.*)

On December 8, 2011, Plaintiff went to the Community Health Center of Branch County complaining of a cough, shortness of breath, and leg weakness; he stated he had been experiencing these symptoms for about two weeks. (Tr. at 345-48.) He had no headache, eye discomfort, nausea, vomiting, diarrhea, abdominal pain, hay fever, pedal edema, calf pain, difficulty with urination, skin rash, enlarged lymph nodes, joint pain, or tick bites. (*Id.*) He was ambulatory to his room, alert, oriented times four, appeared to be in no acute distress, and his respiration was not labored. (*Id.*) After a chest x-ray he was diagnosed with acute bronchitis and pneumonia. (*Id.*)

16

On January 13, 2012, Plaintiff presented to Dr. Whitaker with a tingling sensation of moderate intensity (the record does not specify where) that had started three days previously. (Tr. at 336-38.) He would experience the symptom several times a day and the episode would last for one to two hours each time. (*Id.*) There were no obvious aggravating factors and nothing seemed to relieve the symptoms. (*Id.*) He would also get weakness in his legs, light headedness, tingling in his arms, and fatigue. (*Id.*) His symptoms included fatigue, heartburn, extremely dry skin, dizziness and weakness, and perennial allergies. (*Id.*) He again had normal range of motion, strength and tone, and his motor and sensory function, reflexes, gait, and coordination were all intact. (*Id.*) His tingling sensation was attributed to medication reaction. (*Id.*)

On January 17, 2012, Plaintiff saw Dr. Whitaker for an annual examination. (Tr. at 333-35.) His motor and sensory function, reflexes, gait, and coordination were all intact and his affect and demeanor were appropriate. (*Id.*) Dr. Whitaker's assessment was "[e]levated blood pressure without a diagnosis of hypertension. (*Id.*) Plaintiff received counseling about healthy eating habits and weight loss programs. (*Id.*) Plaintiff followed up with Dr. Whitaker on January 30, and also presented with a cough. (Tr. at 330-32.) A review of his symptoms included fatigue, nasal congestion, extremely dry skin, headaches, perennial allergies, and anxiety. (*Id.*) He had a normal range of motion, strength and tone; his motor and sensory function, reflexes, gait and coordination were all intact; and his affect and demeanor were appropriate. (*Id.*) He was assessed with high triglycerides, cough, and obesity. (*Id.*)

On March 29, 2012, Plaintiff was assessed at Pines Behavioral Health. (Tr. at 319-28.) He reported for services at the recommendation of his attorney with "a desire to get SSI." (*Id.*) He reported struggles with "getting mad at others easily" and punching and kicking things. (*Id.*) His father reported that Plaintiff had problems with learning disabilities in school, would get obsessive,

and did not seem interested in doing anything. (*Id.*) Plaintiff also reported frequent nervousness and sadness. (*Id.*) At this visit he had normal range of motion, strength and tone; his motor and sensory function, reflexes, gait, and coordination were all intact; and his affect and demeanor were appropriate. (*Id.*) He was assessed with high triglycerides, cough, and overweight and obesity. (*Id.*) He was prescribed Tricor. (*Id.*)

Plaintiff's relevant assessments for daily living activities were as follows: He "[s]truggle[d] with mood swings [and] anxiety," he was overweight and had high cholesterol; he had "[n]o significant impairment or problem in functioning" with regard to home stability; he had difficulty communicating with others and a short fuse; he was assessed as being on an irregular schedule for managing time (that is, following a regular schedule for bedtime, waking up, meal time, tardiness, absenteeism, day programs, appointments, and scheduled activities); he had "[n]o significant impairment or problem in functioning" with regard to problem solving (that is, resolving problems of daily living, asking questions for clarity, and setting expectations); he had "[n]o significant impairment or problem in functioning" with family relationships; he had "[n]o significant impairment or problem in functioning" with regard to his social network (that is, getting along with friends, neighbors, coworkers, or other peers); he had a lack of productivity, considering he did not work or help out at home; he needed skills to manage his moods; and he had "[n]o significant impairment or problem in functioning" with regard to complying with community norms and controlling dangerous, violent, aggressive, bizarre, or nuisance behaviors, and respecting the rights of others. (*Id.*)

His mental status was assessed as follows: his general appearance was "overweight"; his intellectual assessment appeared average; his communication was normal; his mood was anxious; his affect was "primarily appropriate"; his speech was "sparse/slow"; his

18

thought/content/perceptions were "unremarkable"; his behavior/motor activity were "normal/alert"; he was oriented to person, place, and time; his insight was poor; his memory was good/normal"; and his reality orientation was intact. (*Id.*) For his risk assessment, he had no current or previous history of suicidality or homicidality, and he was not considered a risk to himself or to others. (*Id.*) His Axis I was mood disorder NOS; his Axis II was learning disorder NOS; his Axis III was "none"; his Axis IV was occupational and economic problems; and his Axis V GAF was 60. (*Id.*) The clinical interpretive summary was that, [b]ased upon the severity and duration of symptoms and functional impairment[s] presented during the interview" Plaintiff was provisionally diagnosed with mental illness and met the criteria for Pines Behavioral Health services. (*Id.*) Plaintiff's readiness to change was assessed as "pre-contemplative." (*Id.*)

### 2.    Plaintiff's Function Report and Testimony at Administrative Hearing

Plaintiff's father filled out the Adult Function Report; he contends that Plaintiff's extreme obesity, mood disorder, reading disorder, and bipolar mood disorder "would make it very hard for h[im] to work or ever find work that he could do." (Tr. at 154-61.) Plaintiff's typical day consisted of waking up, eating, spending about an hour in the bath, going to do schoolwork from 10:00am to 12:00pm, eating lunch, watching television for about an hour, going back to do about two more hours of schoolwork, and resting for the remainder of the day by watching television or going for a bike ride. (*Id.*) He contended that his conditions affect his sleep because he had sleep apnea. (*Id.*)

Plaintiff claimed that he needed reminders to bathe, take care of his hair, shave, and take his medicine. (*Id.*) He did not prepare his own meals because he did not know how to cook except for warming things up in the microwave. (*Id.*) He did very few chores and said he did not do house work or yard work because his extreme weight caused him to tire easily. (*Id.*) He said he did not drive because he was too scared. (*Id.*) He did not pay bills, handle a savings account, or use a

19

checkbook because he was not able to understand a checkbook; however he stated that he did know how to count and spend money. (*Id.*) His hobbies included watching television, playing video games, making wooden items, and building car models. (*Id.*) He had some friends that he spent time with on the weekends. (*Id.*)

Plaintiff also claimed that his condition caused problems with lifting, squatting, bending, walking, kneeling, stair climbing, completing tasks, concentrating, understanding, and following instructions. (*Id.*) He said he could only walk about a block or so before he needed to rest for two to three minutes and that he was only able to pay attention for five to ten minutes. (*Id.*) He said he was not very good at following written or spoken instructions, did not get along very well with authority figures, and feared going around people he did not know. (*Id.*)

At the administrative hearing, Plaintiff testified that he had worked in shipping at Leader Logistics for four weeks but he stopped because it was too hard on his back and knees. (Tr. at 34-35.) He graduated high school by taking special education classes in 2010. (*Id.*) He said his obesity caused back and knee strain, and made it difficult to breathe. (*Id.*) He contended that his obesity was caused by his OCD medication. (*Id.*) He stated that he was taken off of that medicine because of his weight gain and because of concerns that he might develop diabetes. (*Id.*) He testified that he has lost about twenty pounds since going off the medicine. (*Id.*)

Plaintiff testified that his OCD caused him to do things over and over again, that on a typical day he took about three showers, and that he would be very bothered if something was out of place in his room. (Tr. at 36-37) He said that he had violent outbursts once or twice a day, and that during these episodes he usually kicked or threw things. (*Id.*) He also testified that he was scared to leave his house. (Tr. at 38.)

20

Plaintiff said he was able to stand for about thirty to forty minutes at a time, to sit for about an hour at a time, and to walk for about fifteen minutes; he thought he could lift about sixty pounds. (Tr. at 39.) He claimed to not need any help with grooming, that he could help out with chores but at a slow pace, that he did not go shopping, that he spent time with friends at his house, and that he was able to sleep through the night. (Tr. at 39-40.) He stated he would not be able to do even menial tasks because he would have a hard time waking up and his back would make it very difficult. (Tr. at 40-41.)

Plaintiff stated he stopped going to treatment with Dr. Thacker for his mental problems in 2006 for "[n]o real reason." (Tr. at 42.) He said he had not received any treatment for his mental problems from 2006 until a week ago when he began his treatment at Pines. (*Id.*) He explained that he had problems with OCD the whole time he was not seeing anyone for his mental problems. (*Id.*) He also stopped taking the medicines that caused him to gain weight around the time he stopped seeing Dr. Thacker in 2006. (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

An ALJ's decision will not be upheld "where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Commissioner of Social Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).When the Commissioner meets the regulation's goals, it may be irrelevant that the ALJ failed to follow that regulation's procedure; however, if the ALJ deprives the claimant of a substantial right, one that "is intended to confer a procedural protection on the party invoking it," and not one that is only "adopted for the orderly transaction of business before" the agency, then the ALJ's decision must not be upheld. *Wilson*, 378 F.3d at 547.

The ALJ determined that Plaintiff possessed the residual functional capacity to perform a "full range of work . . . but with the following nonexertional limitations: claimant is able to understand, remember and carry out simple, routine and repetitive tasks of the type called for by unskilled work." (Tr. at 22.) The ALJ considered "all symptoms and the extent to which the[] symptoms c[ould] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (*Id.*) He also stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p and 06-3p." (*Id.*) He went on to find that, while Plaintiff's ability to perform work at all exertional levels had been compromised by his nonexertional limitations, those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (*Id.*)

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

As indicated above, if the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.

Plaintiff moves for summary judgment arguing only that "the Commissioner erred as a matter of law in failing to properly evaluate the medical records and opinions of evidence, and thereby, formed an inaccurate hypothetical that did not accurately portray Mr. Barber's impairments." (Doc. 9 at 7.) Defendant moves for summary judgment because "[t]he

administrative record demonstrates that the decision of the Commissioner is supported by substantial evidence . . . ." (Doc. 10 at 1.) Defendant also contends that Plaintiff has not briefed any claims with enough specificity to avoid waiver of the arguments. (*Id.* at 10.)

### a.   Plaintiff's Brief

Presumably Plaintiff's Motion for Summary Judgment is based on an argument that the ALJ's decision was not supported by substantial evidence. However, Plaintiff barely asserts lack of substantial evidence and does not support the assertion in his brief. His fourth statement in support of his brief reads, "[t]he evidence in the record establishes that the Defendant's final decision was based upon errors of law, giving rights to a final decision that is not supported by substantial evidence . . . ." (Doc. 9 at 1.) Plaintiff's "Legal Argument" section consists of only one subsection: "The Commissioner erred as a matter of law in failing to properly evaluate the medical records and opinions of evidence, and thereby, formed an inaccurate hypothetical that did not accurately portray Mr. Barber's impairments." (Doc. 9 at 7 (emphasis omitted).) The only attempt that he makes to explain why this amounts to lack of substantial evidence is as follows: "[b]ecause each element of the hypothetical does not accurately describe Mr. Barber in all significant, relevant respects, the VE's testimony at the hearing, in regard to the first hypothetical, should not constitute substantial evidence." (Doc. 9 at 8.)

Plaintiff's brief is a patchwork of social security law, containing almost no explanation of why the cited law is included and essentially no analysis of why or how the law applies to Plaintiff's case. First, Plaintiff gives a three-quarters page statement of facts section. (Doc. 9 at 5.)[3]

---

[3] This section includes the following inaccurate fact: "[b]ased upon the testimony of a Vocational Expert (VE) the ALJ determined that Mr. Barber was able to perform work at all exertional levels." (Citing Tr. at 25.)" There was no VE at this administrative hearing.

Next comes the argument laid out above that the hypothetical question posed to the VE does not accurately describe Plaintiff, which is preceded by case law, including a half-page block quotation, regarding the Commissioner meeting her burden at step five by relying on a VE. (Doc. 9 at 8). The reader has to make it through a large block quotation from 20 C.F.R. § 404.1527(d)(2) regarding weight given to medical opinions from treating sources; a half-page block quotation from Social Security Ruling 96-8p, which lays out what must be included in the RFC when symptoms such as pain are alleged; and a citation to 20 C.F.R. § 404.1527, which requires controlling weight be given to well-supported medical opinions from treating sources that are not inconsistent with the record, before finding the only other reference to facts from Plaintiff's case:

> "[h]ere it is documented that Mr. Barber has borderline intellectual functioning, yet the ALJ found the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Further, the ALJ stated that these non-exertional limitations that the claimant suffers from have little or no effect on the occupational base of unskilled work at all exertional levels. The determination that Mr. Barber can perform jobs, any job, is erroneous.
>
> The claimant testified at the hearing that he is able to sit for a brief period of time before he has to stand because he has extreme back pain. He can only stand for 30-40 minutes before he has to sit, and he's also limited in his ability to walk to about 15 minutes before he has to rest. As a result of the back pain, knee pain, and anxiety, Mr. Barber has been largely unemployable. He has only held a job for about 4 weeks. More so, he doesn't have a valid driver's license because of the anxiety. It seems unlikely, and rather flawed, to opine that an individual would be able to function on a daily basis, at work, while they are routinely under extreme anxiety, do not have a driver's license because of it, suffer from back and knee pain, and even has [sic] violent outbursts.
>
> Due to Mr. Barber's severe and sporadic back[] and[] knee pain that occurs with any activity, as well as extreme anxiety, he is limited in his ability to freely live. As a result, Mr. Barber would struggle to work, let alone perform an eight hour a day, five day per week, 40 hour[] week.
>
> Finding that Mr. Barber is capable of performing a full range of work at all exertional levels does not adequately address his physical and mental limitations. To subject Mr. Barber to these positions may, in turn, subject him to more pain and suffering. Therefore, these findings are erroneous.

Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified; it's inhumane. Even the ALJ indicated that the 'claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms,[] however, her [sic][4] statements concerning the intensity, persistence, and limiting effects are 'not credible to the extent they are inconsistent with the above residual functional capacity assessment.'

Mr. Barber is incapable of performing even these representative sedentary unskilled jobs. Each of these jobs requires sitting or standing for extended periods of time, possible lifting, walking, bending, bending of the knees, crouching down, *interaction with the public*, and not to mention a clear mind, which he does not possess.

(*Id.* at 8-10 (internal citations omitted).) After this, Plaintiff ends his brief with a plea to reverse and remand. (*Id.* at 10.)

Plaintiff's only argument, that the hypothetical posed to the VE was faulty, has obviously been recycled from other cases where VEs have testified at administrative hearings. However, *in this case there was no vocational expert ("VE") present at the administrative hearing*, so there could not have been a hypothetical posed to the VE. (Tr. at 32.) Therefore, Plaintiff's only offered argument makes no sense and has no place in his brief.

Unfortunately, with Plaintiff's only argument gone, all that remains are fragments of case law and regulations with no indication of how they apply to Plaintiff's case; a restatement of Plaintiff's symptoms with no citations to acceptable medical source opinions regarding their limiting effects; and assertions that the ALJ erred.

---

[4] Plaintiff is misquoting the transcript here. Plaintiff cites page twenty-three of the transcript, but quotes the ALJ as saying "her statements," when the ALJ actually said "the claimant's statements." (Tr. at 23.)

25

### b.      Waiver Law and Analysis

When issues are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," they are deemed waived. *McPherson v. Kelsey*, 125 F. 3d 989, 995-96 (6th Cir. 1997). This district has found that when a party's brief is "completely devoid of any discernable legal argument" the plaintiff's motion should be denied since the only argument in it has been waived. *Burger v. Commissioner of Social Security*, No. 12-11763,2013 WL 2285375 (E.D. Mich. May 23, 2013). "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones. *McPherson*, 125 F.3d at 995-96.

Despite an index of authorities that only lists two cases, two sections of the C.F.R., and one Social Security Ruling, (Doc. 9 at 3), the bulk of Plaintiff's brief is block quotations and citations. Most of these are islands with no indication of how or why the law applies to the facts of Plaintiff's case. Plaintiff leaves the Court to speculate how the cited law applies to his case. Therefore, because Plaintiff has not properly developed any claims or arguments in his brief, I suggest that any inchoate claims or arguments have been waived and accordingly will not be integrated into the substantial evidence analysis below.

Specifically, Plaintiff has not developed any claim that the Commissioner failed to meet the burden at step five. *See* 20 C.F.R. § 404.1520 ("Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.") Plaintiff's recitation of the regulations and case law requiring the Commissioner to meet the burden of showing that work exists in sufficient numbers is not a sufficiently developed argument to avoid waiver because it only switches the word "claimant" with "Mr. Barber" and it does not explain how the Commissioner did not meet the burden. (Doc. 9 at 7 (citing 20 C.F.R. §§ 404.1520(b)-(f); *Varley*

26

*v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 781 (6th Cir. 1987)).) Further, the allegation that the Commissioner did not meet this burden because of a faulty hypothetical question to the VE not only is undeveloped because it does not analyze the facts of this case, but it is contrary to the facts of the case because there *was no VE at the administrative hearing*. (Tr. at 30-44.)

Plaintiff has likewise failed to develop and I suggest has therefore waived any arguments regarding the weight the ALJ gave to treating source and non-treating source opinions, impairments that the ALJ did or did not factor into the RFC, the ALJ's credibility determination, the ALJ's determination of Plaintiff's RFC, and the ALJ's determination that Plaintiff's nonexertional limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. at 19-25.) Plaintiff cites case law and regulations, but the only time that Plaintiff raises facts specific to his case is excerpted above. From the excerpt above, it is very difficult to isolate any arguments that are relevant to the case law that Plaintiff cites. I suggest that it is not for this Court to attempt to discern meaning out of what mostly amounts to a regurgitation of Plaintiff's symptoms, without any citations to medical sources explaining how they limit Plaintiff's functioning, and contentions that the ALJ erred, without any explanations of why or how.

### c.     Substantial Evidence Law and Analysis

Even if any potential claims are considered, I suggest that substantial evidence supports the ALJ's decision.  A claimant's statements about pain or other symptoms on their own are not enough to establish disability. 42 C.F.R. § 404.1529. The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations establish the following process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL

374186, at *2. First, the ALJ evaluates symptoms by confirming, with medical signs and laboratory findings, that a medical impairment exists which "could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 404.1529. The ALJ then determines whether that condition could reasonably be expected to produce the alleged symptoms or whether other objective evidence verifies the symptoms. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While a claimant's description of his symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the symptoms simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence regarding the severity and persistence of the symptoms forces the ALJ to consider the following factors: "(I) [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . symptoms; (v) Treatment, other than medication, . . . received for relief of . . . symptoms; (vi) Any other measures . . . used to relieve . . . symptoms." 20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The ALJ found that Plaintiff's obesity did not impose "more than minimal functional limitations on the claimant's ability to perform basic work activities," and was therefore not a severe impairment. (Tr. at 20.) He reasoned that there was "simply no objective medical evidence to support" Plaintiff's testimony "that he [was] unable to walk for greater than fifteen minutes, stand for greater than forty minutes, or sit for greater than one hour." (*Id.*) In coming to this conclusion the ALJ noted that he gave little weight to the state agency medical consultant's opinion that Plaintiff's obesity was severe: he reasoned that the opinion ignored records in which Plaintiff denied physical symptoms, cited two instances where Plaintiff ambulated with a normal gait, and did not cite any "clinically significant findings that would support the assessed" RFC. (Tr. at 20-21.) In the record there are several instances where Plaintiff had a full range of motion and a normal gait. (Tr. at 187, 286, 304, 314, 331, 334, 337, 340.) The only time where Plaintiff ever experienced pain on range of motion was in his left shoulder on April 18, 2011 when Plaintiff complained about shoulder pain and was assessed with muscle strain. (Tr. at 313-14.) Additionally, even at this visit Plaintiff had a normal gait. (*Id.*) Further, Plaintiff points to no medical source opinions that show that the alleged symptoms amount to impairment. Therefore, I suggest the ALJ had substantial evidence to support his finding that Plaintiff's obesity was not severe.

The ALJ found that Plaintiff's medically determinable impairment could "reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of the symptoms were not credible "to the extent they [were] inconsistent with the" RFC. (Tr. at 23.) The ALJ went on to consider the 20 C.F.R. § 404.1529(c) factors and found Plaintiff's "allegations [were] wholly not credible." He considered the fact that Plaintiff discontinued treatment once he had been granted SSI benefits as a child, did not have treatment for a full six years, and resumed treatment, upon the advice of his attorney, one week

before his administrative hearing. (Tr. at 24, 42.) He found it telling that Plaintiff had "no real reason" for discontinuing treatment. (*Id.*) The ALJ also took note of the fact that when Plaintiff was asked at the administrative hearing why he left his job he said it was because of back pain and when he was asked if there were any other reasons he added knee pain, but he never said anything about any mental limitations such as problems comprehending the work. (Tr. at 24, 34-35.)

The ALJ also reasoned that the RFC was consistent with Plaintiff's full-scale IQ of 77, which indicates borderline intellectual functioning. (Tr. at 24.) He also noted that it was consistent with a GAF score of 65, which indicates "mild symptoms or some difficulty in social, occupational, or school functioning, but generally [indicates] functioning pretty well." (*Id.*) And the ALJ noted that, despite Plaintiff's testimony of one or two violent outbursts a day, he reported that his anger was not as bad as it used to be, and that he only got depressed occasionally. (*Id.*) The ALJ fully analyzed the factors laid out in the regulations and therefore, I suggest that the ALJ's credibility determination was supported by substantial evidence.

At step five, the ALJ found that "[t]he claimant's ability to perform work at all exertional levels ha[d] been compromised by nonexertional limitations . . . [however] these limitations ha[d] little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. at 25.)

The Commissioner will find a claimant is not disabled if the RFC and vocational abilities make it possible to do work which exists in the national economy. 20 C.F.R. § 404.1566. "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] . . . live[s] or in several other regions of the country. *Id.* The Commissioner may use a VE if the disability determination issue is whether the claimant's "work skills can be used in other work and the specific occupations in which they can be used," or in "similarly complex issue[s]." *Id.*

When there are no medically determinable exertional limitations, "unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work." SSR 85-15, 1985 WL 56857, at *4. "[T]he first issue is how much the person's occupational base–the entire exertional span from sedentary work through heavy (or very heavy) work–is reduced by the effects of the nonexertional impairment." *Id.* The answer can "range from very little to very much, depending on the nature and extent of the impairment(s)." *Id.* For relatively simple issues, the decisionmaker can rely on 20 C.F.R. § 404.1566 alone. "In more complex cases, a person with specialized knowledge would be helpful." *Id.*

The second issue when there is not an exertional impairment is "whether the person can be expected to make a vocational adjustment considering the interaction of his or her remaining occupational base with his or her age, education, and work experience." The ALJ "must consider sections 404.1562-404.1568 . . . of the regulations, section 204.00 of Appendix 2, and the table rules for specific case situations in Appendix 2. If, despite the nonexertional impairment(s), an individual has a large potential occupational base, he or she would ordinarily not be found disabled in the absence of extreme adversities in age, education, and work experience.

I suggest that the ALJ had substantial evidence to support his decision at step five. Regarding the first issue–determining how Plaintiff's occupational base is reduced–the ALJ found that Plaintiff's limitations had "little or no effect on the occupational base of unskilled work at all exertion levels." (Tr. at 25.) This does appear to be a "simple issue[]" where section 404.1566 should provide a sufficient basis for a factual determination.

The regulations provide additional guidance for determining the effect a limitation has on the occupational base for mental impairments: "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out,

31

and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15. Therefore if there is "[a] substantial loss of ability to meet any of these," it would result in a "severely limit[ed] . . . potential occupational base." *Id.* The record supports the ALJ's determination that any limitations Plaintiff had would have little effect on the occupational base because there is no evidence in the record that Plaintiff had a substantial loss in any of these mental demands.

For the second issue–the occupational base considering Plaintiff's age, education, and work experience–the ALJ considered Sections 404.1562 to 404.1568 as required by the regulations by stating "[c]onsidering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." *See* 20 C.F.R. §§ 404.1562-404.1568 (addressing an exception inapplicable to Plaintiff, the relevancy of age, the relevancy of work experience, and work which exists in the national economy, respectively). Further the ALJ also considered section 204.00 in his decision: "[a] finding of 'not disabled' is therefore appropriate under the framework of section 204.00 . . . ." (Tr. at 25-26.) And, considering Plaintiff is young and has a high school diploma and the occupational base is large, the ALJ's decision is supported by substantial evidence.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   **REVIEW**

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 3, 2014                    /S PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that this Report and Recommendation was filed this date using the Court's CM/ECF system, which delivers a copy to all counsel of record.

Dated: September 3, 2014                      s/*Jean L. Broucek*
                                              Case Manager to Magistrate Judge Morris